IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | |
|---|---|
| TERESA L. EGAN, ) | |
| ) | Case No. 10 C 50206 |
| Plaintiff, ) | |
| ) | Magistrate Judge P. Michael Mahoney |
| v. ) | |
| ) | |
| MICHAEL J. ASTRUE, ) | |
| Commissioner of Social Security, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

I.     **Introduction**

Teresa L. Egan ("Claimant") seeks judicial review of the Social Security Administration

Commissioner's decision to deny her claim for Disability Insurance Benefits ("DIB"), under

Title II of the Social Security Act. *See* 42 U.S.C. § 405(g). This matter is before the Magistrate

Judge pursuant to the consent of both parties, filed on March 10, 2010. *See* 28 U.S.C. § 636(c);

Fed. R. Civ. P. 73.

II.    **Administrative Proceedings**

On May 8, 2008, Claimant applied for Disability Insurance Benefits, alleging a disability

onset date of August 28, 2005. (Tr. 10.) Claimant's initial application was denied on September

12, 2008. (Tr. 10.) Her claim was denied a second time upon reconsideration on October 14,

2008. (Tr. 10.) Claimant then filed a timely request for a hearing before an Administrative Law

Judge ("ALJ") on November 4, 2008. (Tr. 10.) The hearing took place on August 5, 2009, via

video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ Robert C.

Asbille. (Tr. 10.) Claimant appeared and testified in Rockford with her attorney present. (Tr. 10.)

Medical expert ("ME"), Joseph Solovy, M.D., and vocational expert ("VE"), William Newman, also testified before the ALJ. (Tr. 10.) On August 28, 2009, the Claimant's attorney requested a supplemental hearing to present records of a neck surgery and follow-up appointments, and allow the ME to more fully assess her condition. (Tr. 269.)

A supplemental hearing took place on February 22, 2010, via video teleconference between Evanston, Illinois and Rockford, Illinois, before ALJ Robert C. Asbille. (Tr. 10.) Claimant appeared and testified in Rockford with her attorney present. (Tr. 10.) ME Ronald A. Semerdjian, M.D., and VE, Jill K. Radke, also testified before the ALJ. (Tr. 10.)

On February 26, 2010, the ALJ held that Claimant was not disabled and denied her claim for DIB. (Tr. 19.) The ALJ's decision is considered the final decision of the Commissioner. *See* 20 C.F.R. §§ 404.981, 416.1455, 416.1481. Claimant now files a complaint in this Federal District Court, seeking judicial review under 42 U.S.C. § 405(g).

## III.    Background

Claimant was born on July 31, 1963, and was forty-six years old at the time of the supplemental hearing. (Tr. 24.) Claimant stood five feet and eight inches tall, and weighed approximately 192 pounds when she appeared in front of the ALJ. (Tr. 24.) At the time of the hearing, Claimant resided in Sterling, Illinois with her husband. (Tr. 25, 51.) She completed the eleventh grade, and earned a G.E.D. (Tr. 52.)

Claimant states she was diagnosed with degenerative joint disease of the back, in 1992. (Tr. 303.) She stated that she "blew a disc" while lifting a keg and had a discectomy in 1992. (Tr. 303.) Two months later, she claims she was involved in a motor vehicle accident and subsequently had a lumbar fusion at L3-L5. (Tr. 303.) She was able to continue work as a bartender approximately five years after the accident. (Tr. 304.) Following a series of epidural

steroid injections, there was a complete resolution of the back pain, but Claimant reported increasing neck pain. (Tr. 283.) The Claimant never alleged disability related to her lumbar fusion. Her argument solely involves a claim of disability based on head and neck limitations.

The Claimant also stated that she broke her leg in 2006 and she continues to have severe pain, discoloration, and swelling of the leg. (Tr. 304.) She was diagnosed with reflex sympathetic dystrophy (RSD) and still suffers from the symptoms with prolonged walking or standing. (Tr. 304.)

The Claimant stated that she was diagnosed with bipolar disorder. (Tr. 304.) Her doctor referred her to a psychiatrist who told her that her depression was secondary to the fact that she was not working and discharged her. (Tr. 304.) She has not seen a psychiatrist since 2007 and has not taken any new medications. (Tr. 304.)

The Claimant's main previous work was as a bartender. (Tr. 52.) The VE present at the hearing which took place on August 5, 2009, reported bartending as a medium semiskilled profession. (Tr. 52.) Claimant reported that the last time she tried to work, her left side would go numb and she could not move her arms. (Tr. 53.) She attempted to return to work as a bartender from January 2, 2008 to March 13, 2008, but stopped working on her doctor's advice. (Tr. 12.)

In the hearing which took place on August 5, 2009, Claimant testified that she could sometimes wash clothes and wash dishes but is not always able to finish. (Tr. 57.) She further stated that she would sometimes cook but could not go shopping for food. (Tr. 57.) The Claimant testified that she spends the average day reading or on the computer and then goes back to bed. (Tr. 58.) Claimant stated that the furthest she walked in the past month was a block and she can only drive short distances due to swelling in her leg. (Tr. 52, 57.) Furthermore, she stated that she suffers migraines and cannot lift a gallon of milk due to weakness in her upper left extremity.

(Tr. 56, 59.) Claimant reported that she smokes about a pack a day and used to be a heavy drinker. (Tr. 58.)

The ME at the initial hearing testified that the Claimant would be able to sustain sedentary work on an eight-hour a day, 40-hour a week basis. (Tr. 70.) The ME stated that there was no neurological deficit in connection with the lumbar fusion and reflexes were normal. (Tr. 69.) He stated that the Claimant could walk 50 feet with normal joint movement, but standing for a long period of time would generate pain. (Tr. 67.) The ME further stated that the Claimant's surgery on August 18, 2008, was presumably to remove pressure off the nerve roots and hopefully improve the strength of the left upper extremity. (Tr. 67.)

The VE in the initial hearing was given the following hypothetical: an individual of Claimant's age, education and work experience, who can perform the entire universe of exertional or nonexertional work with the exception that she'd be limited to lifting ten pounds occasionally, five pounds frequently, standing and walking two out of eight hours in divided periods, sitting six out of eight hours with a sit/stand option about every half-hour, no ladders, ropes or scaffolds. (Tr. 71-72.) When asked if such a person would be able to return to her past relevant work, the VE said she could not. (Tr. 72.) The VE testified that there was other work such a Claimant could perform including food or beverage order clerk, bench hand assembler, and sorter. (Tr. 72.) The VE further stated that the weakness in the Claimant's upper left extremity reduces the number of positions available by 30 percent. (Tr. 74.)

In the supplementary hearing which took place on February 22, 2010, the Claimant stated that she is unable to help with housework, including washing clothes, washing dishes, and cooking. (Tr. 27.) She testified that she spends her average day sitting in a recliner and watching television for a little bit, and "that's basically it." (Tr. 28.) The Claimant stated that the most she

4

has walked in the past month was just around the house and she has not been outside. (Tr. 27.) Further, she maintains that she is only able to drive short distances. (Tr. 29.) The Claimant also stated that since her surgery on August 18, 2009, her migraines have become less painful. (Tr. 27.)

In the supplemental hearing, the ME stated that there would be a decrease in the range of motion of the neck. (Tr. 36.) When asked if he agreed with the evaluation of the initial hearing's ME, with respect to how much the Claimant can lift, the ME responded, "I don't think he had an opportunity to see what the result of the surgery was." (Tr. 36.) The ME stated that the Claimant could lift ten pounds frequently and twenty pounds occasionally, because her upper extremity strength is 5/5. (Tr. 36-37.) The ME further stated that he did not think there was any limitation on standing, walking, or sitting. (Tr. 37.) The ME believed that bending and stooping would be okay, but crawling would be limited. (Tr. 37-38.) The VE further stated that there was no doubt that the Claimant would not be able to return to her past relevant work. (Tr. 40.) The VE was then asked if there were any jobs that the Claimant could perform if she was limited to sedentary work with a restriction on the movement of her head. (Tr. 41.) The VE stated that jobs were available at that level, including order taker, general office clerk, and receptionist. (Tr. 41-42.)

## IV.  Medical History

### 1.  Neck and Back Pain

Prior to 2008, Claimant had multiple steroid injections in the back and physical therapy. (Tr. 304.) Dr. Juan Ibarra, M.D., delivered approximately three injections per year which showed only mild improvement. (Tr. 304.) Claimant stopped physical therapy in November of 2007. (Tr. 304.)

On November 15, 2007, upon follow-up for causal epidural steroid injection, Dr. Ibarra noted that she no longer had any lower back pain but she does have left-sided neck pain with some radiation that goes into the hand and aggravation of migraine headaches. (Tr. 284.)

After an MRI on November 23, 2007, Dr. Surjit Hermon, M.D., diagnosed the Claimant with cervical spondylosis of C3 through C7 with posterior disc osteophyte complexes and small posterior and left paramedian disc herniation at C3-4. (Tr. 282.) He also noted a small posterior disk osteophyte complex with indentation of the thecal sac at T2-T3. (Tr. 282.)

On January 2, 2008, Dr. Ibarra noted evidence of chronic neck pain which was secondary to left cervical facet syndrome and ordered a percutaneous injection for January 16, 2008. (Tr. 279.) Upon follow-up, on March 5, 2008, Dr. Ibarra stated that the injections completely resolved the Claimant's left-sided neck pain but not the pain in the center of her neck. (Tr. 274.)

After applying for DIB, the Claimant went through multiple consultative evaluations at the request of the Social Security Administration. On July 26, 2008, Dr. Stanley Simon, M.D., M.P.H., spent approximately 30 minutes reviewing forms, interviewing, and examining the Claimant. (Tr. 303.) Dr. Simon noted that the Claimant claimed she was diagnosed with degenerative joint disease of the back in 1992, and had a discectomy, after she "blew a disc" while lifting a keg. (Tr. 303.) She further stated that she was involved in a motor vehicle accident and subsequently had a lumbar fusion at L3-L5. (Tr. 303.) Claimant stated she had physical therapy for approximately one year and she was able to resume work approximately five years after the accident. (Tr. 303-04.) While working, Claimant developed increased pain in her neck and back and was referred to a neurosurgeon, Dr. Yak, who told her she had nerve damage in the back and recommended surgery. (Tr. 304.) After being told that there was an 80 percent chance of paralysis, she decided not to have surgery and was given Vicodin for the pain. (Tr.

304.) The Claimant also stated that she had developed severe headaches and left arm numbness after she started working again in January of 2008. (Tr. 304.)

During his examination of the Claimant's neck, Dr. Simon found there was a decreased range of motion on flexion 40 degrees and extension 45 degrees, side bending right and left 40 degrees, rotation right 70 degrees and rotation left 70 degrees. (Tr. 306.) Dr. Simon further stated that the Claimant was able to get on and off the exam table without difficulty. (Tr. 306.) The range of motion of the shoulders, elbows, and wrists was not limited. (Tr. 306.) The Claimant had tenderness at the L-spine at L2-L5 and the left paraspinous muscle at L2-L5 and a decreased range of motion. (Tr. 306.) Flexion was 90 degrees with pain and side bending left with pain. (Tr. 306.) Overall, it was the impression of Dr. Simon that the Claimant had degenerative joint disease of the lumbar spine and headaches. (Tr. 307.)

On October 9, 2008, Dr. Charles Wabner, M.D., reviewed the medical evidence and noted that the Claimant has a history of back pain and depression, though she did not allege a worsening of the condition or new impairments, and reported subsequent treatment for back pain only, the AP reports the same findings as the prior decision. (Tr. 337.) Based on the evidence of the record, the Claimant's statements were found to be partially credible, she does have a history of back pain and depression. (Tr. 337.)

Dr. Duncan Dinkha, M.D., saw the Claimant on June 19, 2009, for neck pain causing migraines and referred her to Dr. Krishna Chadalavada, M.D., for an MRI of the C-spine. (Tr. 363.) Upon examination, Dr. Chadalavada noted degenerative joint and disk of the cervical spine; bulging disk osteophyte complexes producing mild impingement on the thecal sac and mild spinal stenosis from C3-4 through C6-7 levels; and mild spondylotic impingement over the thecal sac at D2-D3. (Tr. 391.)

Upon referral from Dr. Ibarra, Dr. Todd Alexander, M.D., S.C., a neurosurgeon, examined the Claimant on July 6, 2009. (Tr. 393.) Dr. Alexander noted that she is not improving with nonoperative measures and discussed surgical treatment which would necessitate a significant four-level anterior discectomy and fusion. (Tr. 393.) The Claimant underwent C3-4, C4-5, C5-6 and C6-7 anterior cervical discectomies and Allograft interbody fusions with plate/screw instrumentation on August 18, 2009. (Tr. 409.) The Claimant was "very satisfied" with the results of her surgery and the left upper extremity pain was resolved. (Tr. 409.) Dr. Alexander noted that her upper extremity strength is 5/5 bilaterally and arranged for a follow-up. (Tr. 409.)

On September 28, 2009, Claimant again met with Dr. Alexander. (Tr. 425.) Upon examination, Claimant stated that she is "doing really well," is not having any upper extremity pain, her headaches have resolved, and she has only mild neck pain. (Tr. 425.) Dr. Alexander arranged for another follow-up. (Tr. 425.) As arranged, the Claimant met with Dr. Alexander on November 11, 2009. (Tr. 424.) Dr. Alexander noted that she is doing well and has very little in the way of pain. (Tr. 424.) The pain experienced prior to surgery has "dramatically improved" and her upper extremity strength is 5/5. (Tr. 424.) Upon one final examination, on December 28, 2009, Dr. Alexander expressed that the Claimant felt she is "doing great". (Tr. 432.) He further noted that she has had complete relief of her arm pain and complete relief of her headaches. (Tr. 432.) Her only complaint is some occasional neck pain. (Tr. 432.)

## 2. Right Knee Pain

On July 26, 2008, Dr. Stanley Simon, M.D., M.P.H., spent approximately 30 minutes reviewing forms, interviewing, and examining the Claimant. (Tr. 303.) Dr. Simon noted that the Claimant stated she broke her lower right leg in 2006. (Tr. 304.) The Claimant further stated that

she was diagnosed with reflex sympathetic dystrophy (RSD)[1] and still had the symptoms of pain, swelling, and discoloration of the lower leg with prolonged walking or standing. (Tr. 304.) Upon physical examination, Dr. Simon noted that there was no clubbing, edema, cyanosis, discoloration, or tenderness of the lower right leg. (Tr. 306.) The range of motion of the knee was not limited and the gait was non-antalgic without the use of assistive devices. (Tr. 306.) He further noted that the Claimant could walk greater than 50 feet without support. (Tr. 306.) Overall, it was the impression of Dr. Simon that the Claimant had reflex sympathetic dystrophy. (Tr. 307.)

On November 19, 2008, Claimant visited the Morrison Community Hospital complaining of pain and swelling in her right leg. (Tr. 356.) She stated that she fell two years prior and since then her knee has been giving away and swelling off and on with occasional limitation of weightbearing on the right knee. (Tr. 356.) She further stated that sometimes there is limitation of movement of the right knee, mainly flexion. (Tr. 356.) Dr. Duncan Dinkha, M.D., diagnosed her with right knee pain and referred her for an MRI. (Tr. 357.)

Upon referral, Dr. Eugene Brown, M.D., conducted an MRI and examined the Claimant on December 1, 2008. (Tr. 345.) Dr. Brown noted minimal degenerative changes and some subchondral cyst formation in the joint. (Tr. 346.) Dr. Brown further noted minimal joint effusion and mild chondromalacia[2]. (Tr. 346.)

---

[1] Reflex sympathetic dystrophy, also known as complex regional pain syndrome, is a rare disorder of the sympathetic nervous system that is characterized by chronic, severe pain. The skin over the affected area(s) may become swollen and inflamed. Affected skin may be extremely sensitive to the touch and to hot or cold temperatures. WebMD.com. http://www.webmd.com/brain/reflex-sympathetic-dystrophy-syndrome.
[2] Chondromalacia refers to a softening of the cartilage under the kneecap. It is a common cause of deep knee pain and stiffness and can be associated with pain and stiffness after prolonged sitting and climbing stairs or hills. WebMD.com. http://www.webmd.com/osteoarthritis/osteoarthritis-knee-injuries?page=4.

### 3. Bipolar Disorder

After applying for DIB, the Claimant underwent a 27 minute consultative evaluation at the request of the Social Security Administration on August 8, 2008. (Tr. 310.) Dr. James A. Sales, M.D., noted that the Claimant stated she had last worked three years ago and quit her job because she "didn't want to work with drunks." (Tr. 310.) The Claimant said being at the bar made her irritable and she could not stand the crowd. (Tr. 310.) Dr. Sales further noted that the Claimant stated she was diagnosed with bipolar disorder two years ago but had not taken medication for a year. (Tr. 310.) Prior to the consultative evaluation, the Claimant had not been seen by a psychiatrist other than Dr. Pisipati who diagnosed her with borderline bipolar disorder. (Tr. 311.) The records indicated she was tried on Cymbalta, Paxil, Prozac, Zoloft, Lithium, Wellbutrin, Lexapro, Trazadone, and Remerom which were all ineffective. (Tr. 311.)

Upon examination, Dr. Sales noted that the Claimant did not show any significant emotional reactivity, she denied having had any delusions or hallucinations, and she had good contact with reality. (Tr. 311.) In his summary, Dr. Sales also noted that she had a diagnosis of borderline bipolar disorder at age 45, which is late by standard, and that she was not currently under treatment. (Tr. 312.) Her previous treating psychiatrist made reference in one of the records that she asked for disability and her psychiatrist did not think that she would be eligible. (Tr. 312.) Overall, Dr. Sales' ultimate diagnosis was that the Claimant had bipolar disorder and alcohol abuse by previous diagnosis. (Tr. 312.)

On August 14, 2008, Dr. Shipley commented on the functional limitations of the Claimant. (Tr. 323.) Dr. Shipley noted that the restrictions of daily living are mild. (Tr. 323.) Difficulties in maintaining social functioning, concentration, persistence, or pace are mild. (Tr. 323.) There were no episodes of decompensation. (Tr. 323.) He further stated in his notes that

Dr. Sales felt the Claimant was capable. (Tr. 325.) Claimant did not claim the bipolar disorder to be a contributing factor in her lack of ability to work or perform past relevant work.

### 4. Bronchitis

The Claimant visited the Morrison Community Hospital on July 22, 2009, complaining of a cough and coughing up brown phlegm. (Tr. 365.) Dr. Duncan Dinkha, M.D., noted that the Claimant stated she sometimes had wheezing. (Tr. 365.) Dr. Dinkha also noted that the Claimant smokes a pack of cigarettes per day. (Tr. 365.) Upon examination, he found there were scattered bilateral rhonchi and diagnosed the Claimant with acute bronchitis. (Tr. 365.) Dr. Dinkha ordered the Claimant to take Prednisone, Avelox, and Rubitussin with Codeine. (Tr. 366.)

On July 29, 2009, the Claimant was examined by Dr. Eugene Brown, M.D., who took an x-ray of the Claimant's chest. (Tr. 389.) Upon examination, Dr. Brown found hyperaeration of the lung fields which could indicate some COPD. (Tr. 389.) Overall, Dr. Brown's ultimate diagnosis was that the Claimant had shortness of breath. (Tr. 389.)

### 5. Physical Residual Functional Capacity Assessment

On September 11, 2008, Dr. David Bitzer, M.D., administered a physical residual functional capacity ("RFC") assessment at the request of the Social Security Administration. (Tr. 327.) Dr. Bitzer noted that ChiroMed Physicians stated in a note that the Claimant had a lumbar fusion in 1989. (Tr. 334.) However, the Claimant never alleged disability related to the lower back and only claims limitations related to her head and neck restrictions. According to Dr. Bitzer's examination, Claimant's "exertional limitations" allow her to perform sedentary work: to frequently lift or carry ten pounds, occasionally lift or carry twenty pounds, stand or walk for a total of about six hours in an eight-hour workday, and sit for about six hours in an eight-hour workday. (Tr. 328.) The exertional assessment also reports that Claimant's ability to push or pull

is "unlimited" with consideration of Claimant's "lift and carry" limitations. (Tr. 328.)

Dr. Bitzer also examined Claimant's "postural limitations." (Tr. 259.) According to his report, Claimant can frequently climb ramps and stairs; but she is only able to climb ladders, ropes, and scaffolds occasionally; and can frequently balance, stoop, kneel, crouch, and crawl. (Tr. 329.) However, all of the above are limited by chronic pain in the back and lower extremities. (Tr. 329.)

Dr. Bitzer examined Claimant's "manipulative" and "environmental limitations." (Tr. 330, 331.) According to his report, due to problems associated with Claimant's cervical spine, Claimant's reach is limited in all directions, including overhead, to an occasional basis. (Tr. 330.) His report further states that the Claimant should avoid concentrated exposure to vibration and hazards because she takes Vicodin. (Tr. 331.)

## V.    Standard of Review

The court may affirm, modify or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). The ALJ's legal conclusions are reviewed *de novo*. *Binion v. Charter*, 108 F.3d 780, 782 (7th Cir. 1997). However, the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the [ALJ]." *Id.* The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case are entrusted to the Commissioner. *Schoenfeld v. Apfel,* 237 F.3d 788, 793 (7th Cir. 2001) ("Where conflicting evidence allows reasonable minds to differ as to whether a Claimant is entitled to benefits, the responsibility for that decision falls on the Commissioner.")

If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C § 405(g); *see also Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir.

2002). "Substantial evidence" is "evidence which a reasonable mind would accept as adequate to support a conclusion." *Binion,* 108 F.3d at 782. If the ALJ identifies supporting evidence in the record and builds a "logical bridge" from that evidence to the conclusion, the ALJ's findings are supported by substantial evidence. *Haynes v. Barnhart*, 416 F.3d 621, 626 (7th Cir. 2005). However, if the ALJ's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002).

## VI.    <u>Framework of Decision</u>

The ALJ concluded that Claimant did not meet the Act's definition "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C § 423(d)(3).

The Commissioner proceeds through as many as five steps in determining whether a Claimant is disabled. *See* 20 C.F.R. § 404.1520. The Commissioner sequentially determines the following: (1) whether the Claimant is currently engaged in substantial gainful activity, (2) whether the Claimant suffers from a severe impairment, (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments, (4) whether the Claimant is capable of performing work which the Claimant performed in the past, and (5) whether any other work exists in significant numbers in the national economy which

accommodates the Claimant's residual functional capacity ("RFC") and vocational factors. *See* 20 C.F.R. § 404.1520.

## VII. <u>Analysis</u>

### 1. Step One: Claimant is not currently engaged in substantial gainful activity.

In the Step One analysis, the Commissioner determines whether the Claimant is currently engaged in substantial gainful activity. *See* 20 C.F.R. § 404.1520(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties and is done, or intended to be done, for pay or profit. *See* 20 C.F.R. § 404.1510. If the Claimant is engaged in substantial gainful activity, he or she is found "not disabled" regardless of medical condition, age, education, or work experience, and the inquiry ends. If the Claimant is not engaged in substantial gainful activity, the inquiry proceeds to Step Two.

Here, the ALJ determined that Claimant has not engaged in substantial gainful activity since August 28, 2005, the alleged onset date. (Tr. 12.) The Claimant attempted to return to work as a bartender from January 2, 2008 to March 13, 2008, but stopped working on her doctor's advice. (Tr. 12.) The Claimant's work activity lasted less than three months and ended due to her impairments. (Tr. 12.) This work activity is considered an unsuccessful work attempt and does not constitute disqualifying substantial gainful activity. (Tr. 12.) Neither party disputes this finding. As such, this court affirms the ALJ's Step One determination.

### 2. Step Two: Claimant Suffers From a Severe Impairment.

Step Two requires a determination whether the Claimant is suffering from a severe impairment. A severe impairment is one which significantly limits the Claimant's physical or mental ability to do basic work activities. *See* 20 C.F.R. § 404.1520(c). The Claimant's age, education, and work experience are not considered in making a Step Two severity determination.

*See* 20 C.F.R. § 404.1520(c). If the Claimant suffers a severe impairment, then the inquiry moves on to Step Three. If the Claimant does not suffer a severe impairment, then the Claimant is found "not disabled," and the inquiry ends.

In the present case, the ALJ found that Claimant had the following severe impairments: "lumbar and cervical disc disease, status post C3-4 through C6-7 anterior cervical discectomies and fusions; and history of fracture of leg." (Tr. 12.) Neither party disputes this finding. As such, this court affirms the ALJ's Step Two determination.

### 3. Step Three: Claimant's impairment does not meet or medically equal an impairment in the commissioner's listing of impairments.

At Step Three, the Claimant's impairment is compared to those listed in 20 C.F.R. pt. 404, subpt. P, app. 1 (the "Listings"). The Listings describe, for each of the body's major systems, impairments which are considered severe enough *per se* to prevent a person from adequately performing any significant gainful activity. *See* 20 C.F.R. §§ 404.1525(a); 416.925(a). The Listings streamline the decision process by identifying certain disabled Claimants without need to continue the inquiry. *See Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the Claimant's impairment meets or is medically equivalent to a listed impairment, then the Claimant is found to be disabled, and the inquiry ends. If not, the inquiry moves on to Step Four.

Here, The ALJ found that the Claimant did not have an impairment or combination of impairments that meets or medically equals one of the listed impairments. (Tr. 13.) The medical expert at the supplemental hearing, Dr. Semerdjian, opined that the Claimant's impairments do not meet or equal any listing. (Tr. 13.) Specifically, the Claimant's spinal disorders do not satisfy the listing 1.04 requirements as the Claimant does not have the requisite neurological deficits and

is able to ambulate effectively. (Tr. 13.) Neither party disputes this finding. As such, this court affirms the ALJ's Third Step analysis.

### 4. Step Four: Based on Claimant's residual functional capacity, he is not capable of performing work which he has performed in the past.

At Step Four, the Commissioner determines whether the Claimant's RFC allows the Claimant to return to past relevant work. RFC is a measure of the abilities which the Claimant retains despite his or her impairment. *See* 20 C.F.R. § 404.1545(a), 416.945(a). The RFC assessment is based upon all of the relevant evidence, including: objective medical evidence; treatment; physicians' opinions and observations; and the Claimant's own statements about his or her limitations. *See Id.* Although medical opinions bear strongly upon the determination of the RFC, they are not conclusive. The determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. *See* 20 C.F.R. §§ 404.1527(e)(2), 416.927(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995).

"Past relevant work" is such work previously performed by the Claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. *See* 20 C.F.R. §§ 404.1565(a), 416.965(a); Social Security Ruling 82-62. If the Claimant's RFC allows the Claimant to return to past relevant work, the Claimant will be found "not disabled" and the inquiry ends. If the Claimant is unable to return to past relevant work, the inquiry proceeds to Step Five.

In the present case, before considering the Step Four analysis, the ALJ determined Claimant had the following RFC:

> The Claimant has the residual functional capacity to perform
> sedentary work as defined in CFR 404.1567(a) except the Claimant
> is able to lift and carry 20 pounds occasionally and 10 pounds
> frequently; sit for a total of at least six hours in an eight-hour
> workday with no more than occasional head movements side to

side or up and down; stand and/or walk for a total of about [six] hours in an [eight-hour] workday; no crawling or crouching; and tolerate no more than moderate (less than concentrated) exposure to pulmonary irritants.

(Tr. 13.)

In making this determination, the ALJ asserts that he "considered all symptoms and the extent to which [they] can reasonably be accepted as consistent with the objective medical evidence and other evidence, based on the requirements of 20 CFR 404.1529 and SSRs 96-4p and 96-7p." (Tr. 13.) He also claims to have "considered opinion evidence in accordance with the requirements of 20 CFR 404.1527 and SSRs 96-2p, 96-5p, 96-6p and 06-3p." (Tr. 13.)

In his decision, the ALJ then summarized the medical evidence provided by the Claimant. (Tr. 16.) The court specifically notes the following from the ALJ's discussion:

- Records from Sterling Rock Falls Clinic from April 2008 show that upon examination the Claimant was able to move all extremities and no gross deficits were noted. (Tr. 15.)

- On July 26, 2008, an internist consultative examination showed the Claimant was able to walk without support and had a non-antalgic gait. The upper extremities examination was within normal limits with no restriction in range of motion of the upper extremities and normal gross and fine manipulations. (Tr. 15.)

- On October 8, 2008, the Claimant's treating physician noted that she had degenerative joint disease in the lumbar spine, is able to flex to 90 degrees, and walks with a normal gait. He also noted that the Claimant was on Vicodin but opined that she had no limitations. (Tr. 15.)

- An MRI of the Claimant's right knee was performed on December 1, 2008 and showed only joint effusion with mild chondromalacia and minimal degenerative changes. (Tr. 15.)

- The Claimant underwent C3-4 through C6-8 anterior cervical discectomies and fusions on August 18, 2009. (Tr. 15.)

- On August 22, 2009, Dr. Solovy, the ME at the initial hearing, stated that the effects of the Claimant's recent spine surgery could not be known and could "certainly alter her disability status." (Tr. 15.) Dr. Solovy further noted that the Claimant's bronchial asthma would require limitation to exposure to fumes and poor ventilation. (Tr. 16.)

- In a postoperative note dated December 28, 2009, Claimant's treating neurosurgeon reported that she "is doing well following four-level anterior cervical discectomy and fusion." He further stated that she has had excellent relief of her preoperative symptoms and that she is to return to her normal activities. (Tr. 15.)

- Dr. Semerdjian, the medical expert at the supplemental hearing, opined that the Claimant retains the capacity to lift 10 pounds frequently and 20 pounds occasionally. The Claimant has no limitations in her ability to sit or stand. She would have difficulty performing a job that would require her to move her head in all directions. The Claimant would not be able to crawl because of her head and she would have no difficulty using her hands or arms. (Tr. 16.)

The Claimant never alleged disability related to the lower back and her argument is solely based on limitations caused by restrictions on the head and neck. In addition to what was specifically noted in the ALJ's discussion, the ALJ's decision is supported by the following medical evidence:

- On September 28, 2009, Claimant had a follow-up with her treating neurosurgeon. The treating neurosurgeon noted that "she feels she is doing really well." (Tr. 425.) He stated that she is not having any upper extremity pain and her headaches have resolved. (Tr. 425.) She has only mild neck pain. (Tr. 425.) The treating neurosurgeon further noted that she has had excellent relief of her preoperative symptoms and her x-rays are satisfactory. (Tr. 425.)

- In a postoperative note dated November 9, 2009, Claimant's treating neurosurgeon reported that she "is doing well and has very little in the way of pain." (Tr. 424.) The pain experienced prior to surgery has "improved dramatically." (Tr. 424.) Her upper extremity strength is 5/5 and her x-rays of the cervical spine show good position and alignment. (Tr. 424.) The neurosurgeon further noted that she has had good relief of her preoperative symptoms and is "very satisfied with the results of the surgery." (Tr. 424.)

- In the postoperative note dated December 28, 2009, the treating neurosurgeon reported that the Claimant has had complete relief of her arm pain and complete relief of her headaches. (Tr. 432.) He further noted that Claimant stated, "she feels she is doing great." (Tr. 432.)

The ALJ then discussed the credibility of the Claimant. In doing so, the ALJ summarized the medical evidence provided by the Claimant in relation to the Claimant's testimony. The court specifically notes the following from the ALJ's discussion:

- The Claimant betrayed no evidence of pain or discomfort while testifying at the hearing. (Tr. 16.)

- Claimant's surgery was generally successful and four months after her cervical surgery the treating neurosurgeon reported that the Claimant had excellent relief of her preoperative symptoms. (Tr. 16.)

- The allegedly limited daily activity cannot be objectively verified with any reasonable degree of certainty. (Tr. 16.)

After considering the evidence of record, the ALJ found that "[C]laimant's medically determinable impairment could reasonably be expected to produce the alleged symptoms; however, the [C]laimant's statements concerning the intensity, persistence[,] and limiting effects of these symptoms are not credible to the extent they are inconsistent with the above residual functional capacity assessment." (Tr. 16.) The evidence within the medical record is consistent with the ALJ's findings. In particular, the medical evidence from after Claimant's August 18, 2009 surgery appears to conflict with Claimant's descriptions of her daily activities and limitations. The Claimant never challenged the ALJ's finding on credibility.

After assessing the credibility of the Claimant and producing his RFC determination, the ALJ found that Claimant "is unable to perform past relevant work." (Tr. 17.) Neither party disputes this conclusion as Claimant's past relevant work was as bartender. Bartending, as she performed it, represents a semiskilled medium strength job, which is beyond her assessed RFC. (Tr. 52.) The Court finds the ALJ's conclusion to be supported by substantial evidence in the record and therefore affirms the ALJ's Step Four determination.

   5.    **Step Five: Claimant is capable of performing work existing in substantial numbers in the national economy.**

At Step Five, the Commissioner must establish that the Claimant's RFC allows the Claimant to engage in work found in significant numbers in the national economy. *See* 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon the VE's

testimony, or by showing that the Claimant's RFC, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "Grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the Commissioner establishes that sufficient work exists in the national economy that the Claimant is qualified and able to perform, then the Claimant will be found "not disabled." If no such work exists, the Claimant will be found to be disabled.

At the initial hearing, The ALJ relied on the testimony of a VE to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the state of Illinois. *See* C.F.R. Pt. 404, subpt. P, App. 2, Table No. 2, Rule 201.21, 201.28. The VE testified that given the residual functional capacity assessed by the ME, the Claimant would still be able to perform the requirements of representative occupations such as: food and beverage order clerk (12,200 jobs in the state of Illinois), bench hand assembler (14,800 jobs in the state of Illinois), and sorter (22,900 jobs in the state of Illinois). (Tr. 72.)

At the supplemental hearing, the ALJ relied on the testimony of a vocational expert to determine if Claimant could perform any substantial gainful work that exists in significant numbers within the national economy.  (Tr. 18.) *See* 20 C.F.R. 404.1569, 404.1569(a). The VE testified that a person of Claimant's age, education, work experience, and RFC would be able to perform the requirements of representative occupations such as: courier (3,700 jobs in the Northern Illinois economy), mail clerk (3,100 jobs in the regional economy), counter attendant (3,100 jobs in the regional economy), general office clerk (2,800 jobs in the regional economy), and receptionist (3,000 positions in the region). (Tr. 41.) The ALJ then asked if any positions would be available for the Claimant if she were only able to do sedentary work and had the same

restriction on head movements. (Tr. 41.) The VE testified that the Claimant would be able to perform the requirements of representative occupations such as: order taker (700 positions in the northern Illinois region), general office clerk (2,800 jobs in the regional economy), and receptionist (3,000 jobs in the regional economy). (Tr. 42.) Finally, the VE stated that the mail clerk positions available to the Claimant would be reduced to 2,100 positions due to restrictions on exposure to pulmonary irritants. (Tr. 44.)

Claimant argues that the ALJ did not meet his Step Five burden because all of the jobs cited by the vocational experts at the two hearings are beyond either the exertional or skill level, or both, of the Claimant's RFC found by the ALJ. Claimant asserts that the vocational expert at the first hearing, in response to a hypothetical by the ALJ, listed three jobs: food and beverage order clerk; bench hand assembler; and sorter. Claimant argues that the Dictionary of Occupational Title (DOT) describes bench hand assembler as a light job, not sedentary, as stated by the vocational expert. The Claimant further provides the DOT listings for three "very common" types of sorters, two of which are light in exertion and a third which would violate the head movement restrictions of the ALJ's RFC.

However, as evinced by the ALJ decision, the ALJ did not rely on the testimony of the VE present at the initial hearing. When deciding whether there were jobs that exist in significant numbers in the national economy that the Claimant could perform, the ALJ relied on the expert testimony of the VE present at the supplemental hearing. For this reason, even if the occupations attested to by the initial VE were found to be beyond either the exertional or skill level of the Claimant's RFC found by the ALJ, the testimony did not influence the ALJ's ultimate determination in his Step Five analysis and constitutes harmless error.

Claimant also argues that the order taker and general office clerk positions provided by the VE at the supplemental hearing are described as light jobs, rather than sedentary, under the DOT. Claimant also argues that the remainder of the jobs, by the DOT description, could not be done by an individual given the ALJ's neck limitations and therefore there is not substantial evidence to support the ALJ's decision.

As noted in the first paragraph of the Step Five analysis, when a Claimant's RFC, age, education, and work experience do not coincide exactly with a rule in the Medical-Vocational Guidelines the Commissioner may carry his burden by relying upon the VE's testimony. In regards to the hypothetical used by the ALJ, all that is required is that the hypothetical question be supported by the medical evidence in the record. *Ehrhart v. Sec'y of Health & Human Servs.*, 969 F.2d 534, 540 (7th Cir. 1992).

In the present case, the ALJ determined that the Claimant's RFC was a hybrid of light and sedentary exertion levels. The ALJ came to the conclusion that,

> "…the Claimant has the RFC to perform sedentary work as defined in 20 CFR 404.1567(a) except that the Claimant is able to lift and carry 20 pounds occasionally and 10 pounds frequently; sit for a total of at least six hours in an eight-hour workday with no more than occasional head movements side to side or up and down; stand and/or walk for a total of about six hours in an [eight]-hour workday; no crawling or crouching; and tolerate no more than moderate exposure to pulmonary irritants."

(Tr. 13.)

When the ALJ posed a hypothetical for the VE at the supplemental hearing he stated,

> "She'd be limited to carrying 20 pounds occasionally, 10 pounds frequently. Stand and walk six out of eight hours. She would be limited to just occasional movement of her head up and down and side-to-side. Should be no crawling or crouching. And that's it…Would there be other work she could do?...Now if I reduce it to sedentary work with the same restriction on the head, are there any

jobs at that level?...Are any of the jobs restricted by pulmonary irritants?"

(Tr. 40, 41, 44)

The VE testimony at the supplemental hearing demonstrates that jobs the Claimant can perform exist in significant numbers in the national economy. It appears to be well-established that 1,000 jobs is a significant number. *Liskowitz v. Astrue*, 559 F.3d 736, 743 (7th Cir. 2009). Here, the VE, in response to the first hypothetical, testified that there were 15,700 jobs in the regional economy that the Claimant could perform. (Tr. 41.) Even if the Claimant was restricted to only sedentary work with the same head restriction, the VE testified that this would still leave 6,500 jobs in the regional economy which could be performed by the Claimant. (Tr. 42.) The Court deferentially reviews the ALJ's factual determinations and affirms the ALJ if the decision is supported by substantial evidence in the record. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008). The ALJ is not required to mention every piece of evidence but must provide an "accurate and logical bridge" between the evidence and the conclusion that the Claimant is not disabled. *Id.* As the court indicated in its Step Four analysis, there is substantial evidence in the medical record that supports the hypothetical, which was consistent with the ALJ's RFC determination. The medical evidence shows that no treating physician or medical note indicates that the Claimant is disabled. The ALJ further found the testimony of Claimant not to be credible to the extent that it is inconsistent with the RFC, for the reasons presented in the Step Four analysis. The VE's response, which included occupations of both light and sedentary levels of physical exertion, provided a reliable assessment of which jobs would be appropriate for the Claimant. As such, the ALJ considered the substantial medical evidence in the record, weighed the Claimant's testimony in light of the medical evidence, and

reasonably relied on the testimony of the VE, and drew a logical bridge between that evidence and his decision.

This court finds that substantial evidence supports the ALJ determination that Claimant was capable of performing work existing in significant numbers in the national economy and therefore affirms the ALJ's Step Five determination.

**VIII.** <u>**Conclusion**</u>

In light of the forgoing reasons, the Commissioner's Motion for Summary Judgment is granted, and Claimant's Motion for Summary Judgment is denied.

**ENTER:**

_____
**P. Michael Mahoney, Magistrate Judge**
**United States District Court**

**DATE:**____July 10, 2012_____